**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 CR 00573 |
| | ) | |
| v. | ) | Judge Edmund Chang |
| | ) | |
| | ) | |
| **ROBERT WAKSMUNDZKI** | ) | |
| Defendant | ) | |

**DEFENDANT ROBERT WAKSMUNDZKI'S SENTENCING
MEMORANDUM AND CORRECTIONS TO THE PRESENTENCE REPORT**

Defendant Robert "Flippy" Waksmundzki, by and through his attorney, Steven R. Hunter, respectfully requests that this Honorable Court impose a sentence of three months of incarceration, in accordance with the sentencing purposes and considerations set forth in 18 U.S.C. §3553(a). In support of this request, Mr. Waksmundzki states as follows:

**I.    Background**

For most of us, mistakes made by our parents when we were children or by ourselves when we were teenagers are not something that fundamentally change our entire lives. However, that is the case for Robert Waksmundzki. Robert was born in Nowy Targ, Poland. (See Presentence Report, [hereinafter, PSR], p. 11;¶60). As a young student, he excelled in mathematics and participated in mathematics tournaments. He also earned excellent grades. His parents brought him to the United States for a visit to his sister, Beata, when he was 14 years old. They entered legally with tourist visas. However,

after having seen what the United States had to offer, the visit became permanent. Robert's parents elected not to return and overstayed the expiration on their visas. Robert was not consulted about this decision, and instead simply continued to live with his parents. Robert's parents and sister are his entire immediate family. They were all able to obtain legal status, and they applied for legal status for Robert through his relationship with his sister as soon as she became a citizen. Later, he applied through the Deferred Action Childhood Arrivals, or "DACA" program. Unfortunately for Robert, this case has prevented him from renewing his DACA application.

In addition to being the only member of his family who did not receive legal immigration status, Robert had a difficult adjustment to life in a new country. He enrolled in Curie High School, on the south side of Chicago. That neighborhood is rough, (see Attachment A, Chicago Police Department Crime Statistics), and Robert was an immigrant who spoke limited English and had a passion for mathematics. He did not fit in well with the student body and he was bullied. Even so, he persevered and began to earn excellent grades again and to


Robert, (second from right), and the Curie English as a Second Language class.

participate in mathematics tournaments. Unfortunately, due to financial hardships his family was experiencing, he had to quit the mathematics team and work at the Bobak Sausage Company to help make ends meet at home. (PSR, p.14; ¶79). Robert's parents and sister are honest, hardworking people. His father works in a factory, his mother works as a custodian, and his sister is a realtor. (PSR p.11; ¶61). Robert was taught hard work from an early age. He never became involved in a gang, or broke the law, (PSR p.10; ¶¶52-57), and he never abused drugs or alcohol. (PSR, p.13; ¶72).

Instead, Robert began studying computers through a school pilot program. In particular, he became fascinated with BitTorrent technology. BitTorrent technology is software that allows users share large files, including media, on the internet. Using this technology, Robert launched a website called torrentz.com while he was still a high school senior. At the time, Robert viewed it more as a technical challenge than a means to make money. The site only generated a few hundred dollars a month the first few years. Teenage Robert reasoned that no one was getting hurt and it seemed harmless. In the beginning his site carried a small amount of copyrighted material, but he never took money from users. His website made its money from advertisers who were


Robert as a teenager working on his website.

3

drawn to the internet traffic his website attracted. After a brief period of time, Robert stopped carrying copyrighted material and transformed the website into a search engine that would find downloadable movies elsewhere on the internet. Some of this material was not copyright protected. As the website grew, so did the money. When he started the website, Robert worked at the supermarket, and later got a job as a bank teller, working on his website in his spare time. The pittance the website generated in revenue did not come close to supporting him. But what started as a pet project took on a life of its own. In the last few years of operation the website generated millions of dollars, far more money than Robert ever imagined when he started it as a kid. The money became a curse. In the fall of 2015, the website generated enough money to attract the attention of Federal law enforcement. Robert's assets were frozen, and he was questioned by agents. Suddenly, Robert had to borrow money from his mother to pay for an attorney. Afterword, he chose to cooperate with the U.S. Attorney's office. As part of his work as a confidential informant, he continued to operate his website so that to others nothing would appear unusual. He also retained several properties he had purchased, but with the understanding that eventually they would be forfeited or used as substitute assets to pay restitution. At this point, Robert went out and obtained a series of jobs to support himself. He started out at the IGPM Group, using his computer skills in the Information Technology department. After about seven months, he found a better job with a Temp Agency called Apex Systems,

working as a software engineer for Cooper's Hawk Winery. Four months after that he was offered a permanent full-time job from Cooper's Hawk as a senior application developer, where he worked for several years. In March of 2019, he became a temporary contract worker at Shure, Inc., working as a Senior Web Developer. (See PSR, pp.13-14; ¶¶74-80). Robert obtained these jobs using computer skills that he largely taught himself. He did obtain some of his computer skills by studying computer security at Moraine Valley Community College in 2003-2004 and 2015-2017. (PSR, p.13; ¶74).

Robert delegated his tax preparation to an accountant named Anna Platos. He provided her with his financial records each quarter, and she would tell him what his taxable income was and how much he owed. In 2009 and 2010 she provided figures that were very low, but Robert went along with it anyway. After that year, Robert paid all of the taxes he owed, which amounted to millions of dollars.

In addition, Robert had a partner in Poland who managed the servers that his website used. That person made sure the software was updated and configured correctly, as well as other technical tasks, and received a considerable amount of money from the website revenue, possible 25-35%. When the money paid in taxes is combined with those funds, and one adds in the $5,414,561 seized by the Department of Homeland Security, it becomes apparent that Robert actually retained or spent very little of the money the website earned. In addition, he is responsible for restitution of $194,166 and a

personal money judgment of $9,829,078. This figure will be reduced by the money seized by the Government, but Robert will still be millions of dollars in debt at the time of his sentencing. Even if, as Robert expects, his properties are forfeited as proceeds or substitute assets, Robert will owe more than $3,000,000. And he will almost certainly be deported.

Once Robert is deported he will only be able to see anyone in his family if they travel to Poland to see him. He will almost certainly never be able to legally return to the United States. The one bright spot is that his fiancée, Stanislawa Staszel, has agreed to leave behind her entire life as well and go with Robert to Poland.



## II. Corrections and Objections to Presentence Investigation Report

On page 6, paragraph 15, the PSR states that in 2003 Robert dealt with other websites. In 2003, Robert had a small amount of copyrighted material on his website and he did not deal with other websites. Starting in 2005 or 2006, the website changed to a search engine for other websites. That is when Robert took the steps described in ¶15 of the Presentence Report.

On page 12, ¶66, it states that Robert is in a long-term relationship with Stanislawa Staszel. It would be more accurate to say that they are engaged to be married.

On page 15, ¶82, the value of Robert's assets are overstated by $1,390,000. This happened because the PSR double counts a number of his assets. The Business Holding Waksmundzki LLC, with a value listed at $500,000, includes the $509,236.89 listed as the balance of Chase checking. The Business Holding Panamco LLC, valued at $60,000, includes the Byline Bank account valued at $52,711.59. The Business Holding Highlander LLC is made up entirely of the Oak Lawn Real Estate in Note E, valued at $437,830, and the Frankfort Real Estate in Note F. In addition, the defense believes that the value of the Frankfort property is significantly higher, because it was purchased for about $380,000. The combined value of those properties is the value of Highlander LLC. Therefore, the correct total of assets is actually $1,609,124.87. The defense believes that nearly all of the assets will be forfeited.

On page 17, ¶92, states "…it appears the defendant also can make a lump sum payment of a fine." This is incorrect and the defense objects to the imposition of any fine on top of the money judgment of $9,829,078 and restitution of $194,166. Even after the money seized by the Government is applied to the money judgment in this case, Robert will owe about $3,000,000 as part of the personal money judgment and restitution agreed to in the plea

agreement. This is greater than the assets list in the PSR, and, as stated above, his assets are substantially smaller than stated in the PSR. Since the real estate assets and most of his cash assets will be forfeited to the Government, Robert will have no ability to pay a fine.

On page 20, condition 14 prohibits the defendant from knowingly leaving the judicial district. However, since deportation is likely, and would require him to leave the jurisdiction, the defense requests that this condition be omitted. In addition, condition 16 permits a probation officer to visit the defendant at work. In the unlikely event that Robert is not deported, work visits would have a chilling effect on his employment prospects.

### III. Arguments in Favor of 3 months of incarceration

#### A. Nature and Circumstances of the Offense and History and Characteristics of Robert Waksmundzki

##### i. Lack of Criminal Contacts

A downward variance is necessary and warranted to properly consider Robert Waksmundzki's minimal prior criminal history. Robert Waksmundzki has zero criminal history points. (See PSR, pp.10;¶¶52-57). This is extremely rare for a defendant who is 34 years old. In fact, it is so rare that the Guidelines overstate the risk of recidivism for someone with zero criminal history points. No distinction is made between someone with no past criminal contacts and someone with one criminal history point. But it should, because empirical data shows that someone with no prior contacts with zero criminal history points is less likely to reoffend.

Both the Guidelines and the United States Code allow courts to consider minimal Criminal History. The U.S.S.G. Manual states at §4A1.3 "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." According to §3553(a)(2)(C), the court must "protect the public from further crimes of the defendant." This is to be accomplished by imposing a sentence severe enough to persuade a defendant to never break the law again. Three months of incarceration accomplishes this goal. Someone like Robert has never served any time in jail. The longest period of incarceration that he has seen is the hour or two he spent in the U.S. Marshal's lock up being booked. He doesn't even know anyone who has been incarcerated. For a person like him, three months of incarceration is a very long time. For defendant's with criminal histories and prior arrests, incarceration has less of an impact. For Robert, is a life shattering event.

Furthermore, Criminal History Category I, which covers Robert Waksmundzki, overstates any risk of recidivism. According to the United States Sentencing Commission's own empirical studies, defendants with zero criminal history points recidivate less frequently, and that fact is not considered by the United States Sentencing Guidelines. See "A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score," at 14-15, available at

9

http://www.ussc.gov/publicat/Recidivism SalientFactorCom.pdf. Another Commission study revealed that defendants with one criminal history point is twice as likely to reoffend as a defendant with zero points. (See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at http://www.ussc.gov/research-and-publications/research-publications/2004/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines and Attachment B, Recidivism Chart.) Taking into consideration that this case is the first and only time that Robert has violated the law is just and fair, and will promote respect for the law

### ii. Extraordinary Cooperation

As detailed in the Government's Supplemental version of the offense, Robert provided extensive cooperation to the Government. He began his cooperation immediately by making a statement when he was first approached by agents. Soon after that he proffered several times. In addition, He provided information in multiple cases, and worked as a confidential informant, continuing to operate a website that directed users to other websites that contained copyrighted materials.

He also agreed repeatedly to waive the statute of limitations as it applied to him. Therefore, his case dragged out for almost five years. This delay came at a cost. Robert will almost certainly be deported, and when he is deported, he will start his life over from scratch, with a multi-million-dollar judgment around his neck. With each passing year, starting over becomes more and

more difficult. For example, he is engaged to be married, but he and his fiancée are waiting for the outcome of this case before actually having a wedding, due to the uncertainty. In addition, he can't restart his career in Poland because he must remain in the United States for his cooperation. Since employers in the technology field prefer younger talent, it would have been easier to do this at the age of 29, but Robert agreed to delay his case at the request of the Government.

### iii. History of Employment

Robert Waksmundzki has a strong work ethic, which is demonstrated by his work history. From his first job at the Bobak Sausage Company, to his more recent jobs a software engineer and computer specialist, Robert has worked hard and succeeded. This work ethic makes him a strong candidate to never reoffend. He also currently possesses unique technical skills. (See Attachment C, Resume). A sentence of 3 months of incarceration will allow him to use those skills productively when he is released. But with the fast pace of change in the world technology, his skills will quickly become obsolete if he receives a sentence of many months. New coding languages, apps, software and technology appear every day. A person incarcerated for years will be released to find his skills no longer sought after, and his job prospects few.

### iv. Education and Skills

Education is another factor in Robert Waksmundzki's favor. He has a High School degree, (PSR, p. 13;¶73). He has also studied at Moraine Valley

Community College.  (PSR, p. 13;¶73). Although he did not obtain a degree, the evidence in this case and his resume demonstrate that he has taught himself computer technology to an extent that can reasonably be equated with a college degree.  The same study cited above also shows that recidivism rates differ for offenders with different educational backgrounds. Overall, offenders with less than a high school education are far more likely to recidivate (31.4%) than those with a high school education (19.3%).  People with a college education have even lower rates. [ADD PERCENTAGE] (See "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" at http://www.ussc.gov/research-and-publications/research-publications/2004/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines, at p. 12 and at exhibit 10).

     **v.  Lack of Illicit Drug Use**

Another factor favoring a sentence of 3 months of incarceration is the fact that Robert does not use illegal drugs and never has. (PSR p. 13; ¶72).  Use of illicit drugs has a strong correlation to future criminal activity**.**  Offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0%) than those not using illicit drugs (17.4%).   Id at p. 12 and exhibit 10.

     **vi.  Age**

Recidivism diminishes with age. This fact is confirmed by anecdotal experience and empirical data.  (See Attachment D, Age chart from "Measuring

Recidivism" Id.) Robert is 34, almost 35. Therefore, he is unlikely to commit another crime.

### vii. Collateral Consequences

In the present case, Robert is charged with an Aggravated Felony. Consequently, upon his conviction he will be ineligible for any kind of legal status under U.S. immigration law. It is possible, perhaps even likely, that upon his release from incarceration he will be placed in ICE custody and eventually removed from the United States and transported to the country where he was born, Poland. While the technical term for this is deportation, the defense would argue that it is more accurate to describe it as exile. Robert will be removed against his wishes from the country he considers home. His mother, his father and his sister all live in this country. Robert has no siblings or close family in Poland, only distant relatives. It will be difficult for him to start over in Poland, but with luck he will be able to do it. What he will not be able to do is see his parents as they age, visit them if they are hospitalized, say goodbye in person if they become terminally ill, or attend their funerals. His sister has two children, and he will not be able to see his niece or nephew grow up. Most deportees are being returned to the country they came from, where friends, family and their old life await them. Robert never chose to come to the United States, but his whole life is now here, and it will all be taken away when he is sentenced, no matter what length of sentence he receives.

A sentencing court can, in its discretion, take into account a defendant's status as a deportable alien, see, e.g., *United States v. Mendoza*, 576 F.3d 711, 721 (7th Cir.2009); *United States v. Panaigua–Verdugo*, 537 F.3d 722, 728 (7th Cir.2008). This court can and should consider the harsh immigration consequences to Robert when imposing sentence, and the defense submits that the punishment of removal along with 3 months of incarceration is harsh enough.

### B. A sentence of 3 months of incarceration is sufficient, but not greater than necessary to satisfy established sentencing objectives of 18 U.S.C. §3553(a)(2)

The rule of lenity set forth in 18 U.S.C. 3553(a) requires a sentencing judge to impose a sentence that is sufficient, but not greater than necessary, to meet the statutory sentencing objectives set forth in subsection (a) (2).

#### i. A sentence of 3 months of incarceration reflects the seriousness of the offense, affords adequate deterrence to criminal conduct, and protects the public from future crimes

The sentence in this case must reflect the seriousness of the offense, provide deterrence of future crimes both to Robert Waksmundzki and to the general public, and protect the public. The requested sentence meets all of the objectives. As noted above, the consequences to Robert Waksmundzki are already substantial. Going to be deported and is financially ruined. He is facing the harsh reality that "crime does not pay" and is worse off for having created a website that directed users to copyrighted material.

As for the general public, it is doubtful that anyone beyond Robert's family will pay attention to this case. If there is an observer of this case, that person will conclude it is not worth it. Although Robert Waksmundzki's actions paid his bills in the short run, in the long run he lost all of the money he made and is being deported to a country he has not seen in 20 years, when he was a child. This is adequate to deter others from making the same mistake he made.

### IV. CONCLUSION

The defense respectfully submits that a sentence of 3 months of incarceration, along with restitution and the money judgment detailed in the plea agreement meets all of the goals set forth in 18 U.S.C. §3553. Robert Waksmundzki is a 34-year-old man with zero criminal history. He is extremely unlikely to commit future crimes. A sentence of 3 months of incarceration is sufficient to protect the public but is also just and fair. It is a deterrent, it promotes respect for the law, but it is not more than is necessary to promote the ends of justice. The defense respectfully requests that this court impose that sentence.

Respectfully submitted,

*s/Steven R. Hunter*
Attorney for Robert Waksmundzki

Law Office of Steven R. Hunter
900 West Jackson Boulevard
Suite 5-W

Chicago, Illinois 60607
(312) 466-9466
Atty. No. 6196348

## **CERTIFICATE OF SERVICE**

The undersigned, attorney Steven R. Hunter, hereby certifies that the following document(s):

**DEFENDANT'S SENTENCING MEMORANDUM**

was served on December 3, 2019, in accordance with the FED.R.CIV.P. 5, LR5, and the General Order on Electronic Case Filing (ECF), pursuant to the district court's ECF system as to ECF filers. Non-ECF filers, if any, were sent copies by first class mail or hand delivery.

> By: *s/Steven R. Hunter*
> STEVEN R. HUNTER
> Attorney for Robert Waksmundzki
> 900 West Jackson Boulevard
> Suite 5-W
> Chicago, IL 60607